IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>   v.<br><br>MICHAEL FARRENS, an individual;<br>ROBIN FARRENS, an individual,<br>FARRENS PROPERTIES, LLC, a Limited<br>Liability Company, ROCK AND WATER,<br>LLC, a Limited Liability Company, ROCK<br>AND WATER INTERNATIONAL, LLC,<br>a Limited Liability Company, and DOES 1<br>through 100,<br><br>      Defendants,<br><br>―――――――――――――――――――<br><br>MICHAEL FARRENS, an individual;<br>ROBIN FARRENS, an individual,<br>FARRENS PROPERTIES, LLC, a Limited<br>Liability Company,<br><br>      Counter-Claimants,<br><br>   v.<br><br>NAUTILUS INSURANCE COMPANY,<br><br>      Counter-Defendant. | CV 22-193-M-DWM<br><br><br>OPINION<br>and ORDER |

**Insurance**. An ingenious modern game of chance in which the player is permitted to enjoy the comfortable conviction that he is beating the man who keeps the table.

   *The Devil's Dictionary*, Ambrose Bierce

So it is with the case now before the court, the balance of the insured's comfort measured against the words of the insurance policy. This insurance coverage dispute arises out of the construction of a "disappearing floor" pool at a residential home in Whitefish, Montana. What is at issue is whether Nautilus Insurance Company has a duty to indemnify homeowners Michael and Robin Farrens (the "Farrens") for the millions in damages awarded by a trial jury based on the project. Because several policy exclusions bar coverage, summary judgment is granted in favor of Nautilus.

## BACKGROUND[1]

### I.  The Project

In 2014, the Farrens engaged Rock and Water, LLC to construct a floating or disappearing deck/floor pool and spa at their home in Whitefish, Montana. (Doc. 42 at ¶¶ 6, 7.) The pool and spa included several water features such as an infinity edge, a basin to catch the water overspilling the edge (a "vanishing edge basin"), a moveable and disappearing pool and spa deck (a "floating" or "disappearing" floor), a waterslide, and a fire pit. (*Id.* ¶ 7.) Construction began in 2015 and ended in 2018. (*Id.* ¶ 8.) Because Rock and Water had not previously built a floating floor pool, to avoid paying an engineer, its owner Sean Henry designed a nine-ballast-tank system himself based on information he found on YouTube. (*Id.* ¶¶ 9,

---

[1] The facts are undisputed unless otherwise noted. (*See* Docs. 33, 40, 42, 45.)

10, 11.)  Although the system's operation is disputed, the general idea was that the tanks would fill with air and make the floor float to create a deck and then fill with water and sink to reveal the pool.  (*See id.* ¶ 10.)  The tanks and the frame used to lift the floor were made of aluminum, (*id.* ¶¶ 11, 13), and the floating floor was made of Ipe wood, (*id.* ¶ 12).

Although many aspects of the pool and deck were completed in July 2016, there were immediate problems with the floating floor's operation.  (*See id.* ¶¶ 14, 15.)  Specifically, the floor would not raise or lower evenly and therefore jammed inside the pool shell.  (*Id.* ¶ 16.)  The defect occurred every time the floor was moved, (*id.*), damaging the pool shell and the Ipe wood flooring, (*id.* ¶¶ 21, 23). The aluminum tanks began to corrode due to its contact with chlorine.  (*Id.* ¶¶ 11, 18–20.)  Additionally, 15,000 gallons of water were released down the hillside below the pool every time the floor was moved, eroding the soil and requiring the installation of riprap.  (*Id.* ¶¶ 24–25.)

## II.   The Underlying Action

In November 2018, the Farrens sued Rock and Water in state court.  (*Id.* ¶ 26.)  Nautilus, under a reservation of rights, provided a defense.  (*Id.* ¶ 27.)  In March 2022, a four-day jury trial was held in Flathead County.  (*Id.* ¶ 30.)  The jury awarded the Farrens damages for the repairs in the amount of $4.5 million and found them 20 percent contributorily negligent.  (*Id.*)  The jury also awarded the

3

Farrens $100,000 for damages suffered from a loss of use and $100,000 for damages suffered due to emotional distress. (*Id.*) Accordingly, the state court entered judgment against Rock and Water in the amount of $3.76 million in damages and $11,976.49 in costs. (*Id.* ¶ 31.)

## III.   The Policies and the Present Action

From 2016 to 2018, Rock and Water was insured by a Commercial General Liability Policy issued by Nautilus (the "Policies").[2] (*Id.* ¶ 2; *see* Docs. 37-1, 37-2, 37-3.) Under all three Policies, the General Aggregate Limit on insurance is $2,000,000 (other than products/completed operations) and the limit occurrence is $1,000,000. (Doc. 42 at ¶¶ 4, 5.) Under the 2016 and 2017 Policies, the "products/completed operations aggregate limit" is stated as "$INCLUDED," and for the 2018 Policy it is stated as "$2,000,000." (*Id.*) The Farrens offered to settle for the $1,000,000 policy limits twice prior to the state court trial. (*See id.* ¶ 28.) Nautilus did not accept either offer.

In December 2022, Nautilus filed this federal case, seeking a declaratory judgment that there is no coverage under the Policies, and therefore no duty to indemnify, and that even if coverage was triggered, a number of policy exclusions

---

[2] These policies are in the record no less than four times. References herein are to the policies collectively (the "Policies") or based on the policy year (*e.g.*, "2016 Policy") and refer to the policies attached to the Amended Complaint. (*See* Docs. 37-1, 37-2, 37-3.)

apply. (*See* Docs. 1, 37.) The Farrens answered and filed a counterclaim against Nautilus, seeking a declaration that Nautilus has a duty to indemnify and that, because it acted in bad faith in failing to settle for policy limits, it has an obligation to pay judgment in excess of the policy limits. (*See* Docs. 17, 43.) The parties filed cross-motions for summary judgment. (Docs. 31, 38.) The Farrens subsequently filed a motion to dismiss their bad faith counterclaims. (*See* Doc. 48.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the non-moving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014). On cross-motions for summary judgment, it is the court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether the evidence demonstrates a genuine issue of material fact." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001). Each

motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (quotation marks omitted).

ANALYSIS

The duty to indemnify "arises only if coverage under the policy is actually established." *St. Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 410–11 (Mont. 2013). "Put another way, while an insurer's duty to defend is triggered by allegations, an insurer's duty to indemnify hinges not on the facts the claimant alleges and hopes to prove but instead on the facts, proven, stipulated or otherwise established that actually create the insured's liability." *Id.* at 411 (internal quotation marks and alteration omitted). "[T]he contractual duty to indemnify is [therefore] breached when an insurer has wrongfully refused to provide coverage to an insured . . . [when] "the established facts trigger coverage under the terms of the policy, and . . . the extent of the claimant's damages are undisputed or clearly exceed policy limits." *Id.* (internal quotation marks omitted).

The interpretation of an insurance contract presents a question of law. *Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 395 (Mont. 2008). Such contracts must be examined as a whole, *id.*, and interpreted according to their "usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products," *Park Place Apartments, LLC v. Farmers Union*

6

*Mut. Ins. Co.*, 247 P.3d 236, 239 (Mont. 2010).  Nevertheless, clear and explicit

terms in a contract are to be enforced as written, *Allstate Ins. Co. v. Wagner-*

*Ellsworth*, 188 P.3d 1042, 1046 (Mont. 2008), and the insured has the burden to

establish coverage under a policy's general coverage provision, *Travelers Cas. &*

*Sur. Co. v. Ribi Immunochem Rsch., Inc.*, 108 P.3d 469, 476 (Mont. 2005).  In turn,

the burden rests on the insurer to show that a coverage exclusion applies.  *Id.*

"Exclusions from coverage are to be narrowly and strictly construed because they

are contrary to the fundamental protective purpose of an insurance policy." *Park*

*Place*, 247 P.3d at 239.

Here, the parties dispute whether coverage was triggered in the first instance

and, if so, whether any policy exclusions apply.  Ultimately, while coverage was

initially triggered, Nautilus is correct that several policy exclusions apply,

alleviating its duty to indemnify the Farrens for their losses.

## I.   Occurrence

Coverage under the Policies is triggered only if there is "bodily injury" or

"property damage" caused by an "occurrence."  (*See, e.g.*, Doc. 37-1 at 11.)  The

parties do not dispute that the Farrens suffered property damage; thus, coverage

turns on the existence of an "occurrence."  "Occurrence" is defined as "an

accident, including continuous or repeated exposure to substantially the same

general harmful conditions." (*See, e.g.*, *id.* at 24.)  In interpreting what an

7

occurrence is, courts employ a two-part test: "(1) whether the act itself was intentional, and (2) if so, whether the consequence or resulting harm stemming from the act was intended or expected from the actor's standpoint." *Emp'rs Mut. Cas. Co. v. Fisher Builders, Inc.*, 371 P.3d 375, 378 (Mont. 2016).  If the answer to either inquiry is "no," the act is an occurrence. *Id.*  Here, Nautilus argues that there is no coverage because: (1) the damage was the product of defective workmanship, which is never considered an occurrence,[3] and (2) the damage was exclusively to Rock and Water's own work product.  The Farrens disagree on both points, insisting that because an occurrence includes intentional acts with unexpected results, it can apply in circumstances such as those that occurred here.

In insisting that defective workmanship is per se not covered, Nautilus relies primarily on *Phoenix Insurance Co. v. Ed Boland Construction, Inc.*, a duty-to-defend case involving construction delays caused by an errant subcontractor.  229 F. Supp. 3d 1183, 1187–88 (D. Mont. 2017).  In that case the court stated that "Montana federal courts, applying Montana law, have concluded that defective workmanship is not considered an 'occurrence' under the insuring language of a [commercial general liability] policy."  229 F. Supp. 3d 1183, 1190 (D. Mont. 2017).  But no further analysis was provided, and while *Phoenix* cited two federal

---

[3] Nautilus does not dispute that the erosion damage to the hillside below the pool qualifies as an occurrence.  (*See* Doc. 39 at 13.)  It maintains, however, that the resulting damage is not covered for other reasons discussed below.  (*Id.*)

district court decisions, *see Northland Cas. Co. v. Mulroy*, 2015 WL 4461882 (D.

Mont. 2015), *and King v. State Farm & Cas. Co.*, 2010 WL 1994708 (D. Mont.

2010), neither bolsters Nautilus' argument here.  Notably, both *Northland* and

*King* pre-date *Fisher*, which, as stated above, clarified the two-part test for

assessing an "occurrence" under Montana law.  The Montana Supreme Court

explained in *Fisher* its previous decisions "ha[ve] not been consistent in the

analysis to be applied when considering this coverage issue."  371 P.3d at 380.

The *Fisher* Court was specifically critical of its reasoning in *Blair v. Mid-

Continent Casualty Co.*, 167 P.3d 888 (Mont. 2007), a case heavily relied on in

*King*.  Moreover, *Northland*—which involved the failure to treat logs with a

pesticide prior to installation in a log home—was reversed and remanded by the

Ninth Circuit on the basis that material disputes of fact existed "as to whether [the

contractor] knew about the industry practice of treating logs with insecticide and

consciously chose not to treat the logs and as to whether the beetle infestation

should have been reasonably expected."  *Northland Cas. Co. v. Nw. Log Homes,

LLC*, 713 F. App'x 713, 714 (9th Cir. 2018) ("*Northland II*").

What this means, contrary to Nautilus's position, is that defective

workmanship is not per se excluded from the definition of an occurrence; rather,

consistent with *Fisher*, "an event is an occurrence or accident unless the act

causing the event 'was intentional' and 'the consequences or resulting harm

9

stemming from the act was [objectively] intended or expected from the actor's standpoint.'" *Id.* (quoting *Fisher*, 371 P.3d at 378 (alteration in original)). Indeed, as explained in *Western Heritage Insurance Co. v. Slopeside Condominium Association, Inc.*, "an 'occurrence' may be found where 'an initial act of intention . . . led to unexpected results.'" 371 F. Supp. 3d 828, 832 (D. Mont. 2019) (quoting *Fisher*, 371 P.3d at 380). And "[w]here the Montana Supreme Court has determined that harm was objectively intended or expected, the insured's conduct suggested that the insured had some particular reason to believe that [its] acts were likely to cause harm." *Id.* (citing *Fisher*, 371 P.3d at 379). In *Slopeside*, for example, a contractor intentionally installed thermal T-panels on condo roofs to melt snow, causing substantial damage to the underlying buildings. 371 F. Supp. 3d at 831. Judge Christensen found that the contractor's conduct was an occurrence, explaining that the contractor's work "damaged Slopeside's buildings only to the degree that his work was performed negligently. No facts suggest that a contractor in [his] position should have expected or been aware of Slopeside's impending damages, even if the damages were foreseeable under the general negligence standard." *Id.* at 832–33. Accordingly, the Court could not "conclude that [the contractor] intended or expected his installation of the T-panel systems to cause property damage to the Slopeside buildings." *Id.* at 832.

10

Nautilus attempts to distinguish *Slopeside* on the basis that, in *Slopeside*, the damage was inflicted on property other than the faulty work product itself (the T-panel system installed by the contractor on the roof damaged the underlying buildings). According to Nautilus, "a commercial general liability policy does not provide coverage for faulty workmanship that damages only the resulting work product." (Doc. 39 at 12 (quoting 14 *Couch on Insurance* § 129:4 (3d ed. West 2014)) (emphasis omitted).) And here, the alleged damage stems from the pool fixtures installed by Rock and Water itself. The argument ignores the specific considerations outlined by *Fisher*, which include no such prohibition. This factual nuance is further highlighted by the fact that Nautilus' only authority for its assertion is a general treatise on insurance law. This argument is of no help to Nautilus.

Because there appears to be no dispute that Rock and Water's installation of the floating pool system and its components—such as the aluminum—was an intentional act, the dispositive inquiry under *Fisher* is whether Rock and Water intended or expected the Farrens' damages. Because it relies on the arguments made above, Nautilus does not directly argue this point. But applying an objective standard, the record shows that Rock and Water did not intend or expect its floating floor to cause the resulting damage. It is undisputed that Sean Henry did not anticipate that the floor would bind when it was raised or lowered, which

11

damaged the mechanism, the pool shell, and the Ipe wood flooring. (*See* Doc. 42 at ¶¶ 16, 21.)  It is also undisputed that Sean Henry did not research the effect chlorine would have on the aluminum components, (*id.* ¶ 19), which caused additional damage to the spa frame and hydraulics, (*id.* ¶¶ 19–20).  Although the parties disagree whether the lift system caused the pool epoxy to delaminate or whether the epoxy was simply the wrong product for this job, (*see id.* ¶ 22), that damage was equally unexpected and unintended.  Indeed, Rock and Water contacted the epoxy manufacturer who stated that it was not the application here that caused the problem, but rather the coating had failed on other jobs in Montana. (*See id.*)

Because the Farrens' damages arose from the unanticipated and unexpected consequence of Rock and Water's design and work, Rock and Water's installation of the floating floor and its component parts constitutes an "occurrence," triggering coverage under the Policies.

## II.    Exclusions

Nautilus argues that even if coverage was triggered, the Policies contain several applicable exclusions.  Although Nautilus initially relied on five exclusions, the parties have since agreed that two, Business Risk Exclusions k and

1,[4] are inapplicable. (*See* Doc. 47 at 14.)  The remaining exclusions are the

Business Risk Exclusion j(5), the Business Risk Exclusion j(6), and the

Professional Liability Exclusion.  All three exclusions bar coverage.

### A.   Business Risk Exclusions j(5)

Exclusion j(5) excludes coverage for "[p]roperty damage to . . . [t]hat

particular part of real property on which you or any contractors or subcontractors

working directly or indirectly on your behalf are performing operations, if the

'property damage' arises out of those operations." (*See, e.g.*, Doc. 37-1 at 14–15.)

The parties agree that the pool, spa, and water features Rock and Water constructed

qualify as "real property." (*See* Doc. 44 at 17–20; Doc. 47 at 9.)  The parties also

agree that Rock and Water's work on the project remained ongoing through 2018.

(*See* Doc. 42 at ¶ 8.)  Nautilus therefore argues that the damage to these items is

excluded because it occurred when Rock and Water was performing operations on

or immediately adjacent to them.  In response, the Farrens argue that "particular

part" is limited to the discrete project component at issue, not the pool area as a

---

[4] Exclusion k excludes coverage for damage to the insured's "product." (*See e.g.*, Doc. 37-1 at 15.)  It does not apply because the parties agree the pool, spa, and water features are "real property," which does not fall within the definition of "product." (*See* Doc. 47 at 14.)  Exclusion l excludes coverage for damage to work included in the "products-completed operations hazard." (*See e.g.*, Doc. 37-1 at 15).  It does not apply because the parties agree that none of the damages awarded were for work included within the "products-completed operations hazard." (*See* Doc. 47 at 14.)

whole.  Nautilus disagrees, arguing that while "particular part" is narrower than the residence, it encompasses the entire pool area in which all of Rock and Water's work was performed.  On this point Nautilus has the better argument.

This Court has previously considered the spatial scope of the j(5) exclusion. In *Roaring Lion, LLC v. Nautilus Insurance Co.*, the plaintiff alleged that the questioned exclusion did not bar coverage for damaged framing caused by faulty foundation work.  2011 WL 3956132, at *3–4 (D. Mont. July 15, 2011).  The plaintiff argued that the exception only applied to the "particular part" of the property on which the faulty work was performed, i.e., the foundation, not the properly constructed framing.  *Id.* at *4.  Nautilus disagreed, insisting that j(5) excluded coverage for any damage to the cabin, because all of the cabin was the work of the insured.  *Id.* at *5.  The Court agreed with the plaintiff, adopting Magistrate Judge Lynch's conclusion that j(5) is ambiguous and, when construed in favor of the insured, only bars coverage for damage to the component part of the real property on which the defective work was performed.  *Id.* at *5–6.  As a result, j(5) barred coverage for the damaged foundation but not the damaged framing. That interpretation was then reaffirmed in *Lukes v. Mid-Continent Casualty Co.*, wherein the insurer unsuccessfully attempted to invoke j(5) to bar coverage for damage caused to a house by faulty siding.  2013 WL 496203, at *3 (D. Mont. Feb. 11, 2013).

14

Here, the Farrens seek to slice the salami even thinner, insisting that because Rock and Water was only working on the floating floor at the time the damage occurred from either jamming the floor or adding the chlorine, the resulting harm to the properly installed and completed pool shell, aluminum tanks, spa frame, and deck floor is not excluded from coverage. Although neither this Court nor the Montana Supreme Court has analyzed j(5) at this scale, the Farrens' argument is not altogether novel. The Sixth Circuit held the identical "particular part" language in j(6) means "the distinct component parts of a building—things like the interior drywall, stud framing, electrical wiring, or[] . . . the foundation." *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 311 (6th Cir. 2010) (internal quotation marks omitted). However, the Sixth Circuit relied on a Fifth Circuit case in reaching its conclusion and, in that Fifth Circuit case, the court focused on the fact that the faulty exterior work and retaining walls at issue "were distinct component parts that were each the subject of separate construction processes and are severable from the interior drywall, stud framing, electrical wiring, and wood flooring." *Mid-Continent Cas. Co. v. JHP Dev't, Inc.*, 557 F.3d 207, 217 (5th Cir. 2009). That is not the case here. The pool shell, aluminum tanks, spa frame, and deck floor were all part of the floating floor pool system upon which Rock and Water continued to perform work until April 2018. As such, the alleged property damage was to the particular part of real property that was the

15

direct focus of Rock and Water's continued operation.  Coverage is therefore excluded under j(5).

**B.     Business Risk Exclusion j(6)**

Exclusion j(6) precludes coverage for "[p]roperty damage to . . . [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (*See, e.g.*, Doc. 37-1 at 14–15.)  The Policies define "your work" as Rock and Water's "[w]ork or operations," "[m]aterials, parts or equipment furnished in connection with such work or operations," or "[w]arranties and representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.'" (*See, e.g.*, Doc. 37-1 at 25.)  Nautilus argues that this exclusion applies because "all of the awarded damages[] . . . were to replace Rock and Water's own work product (or the materials, parts and equipment used in connection with that work) because Rock and Water's work was done incorrectly." (Doc. 39 at 18.)  In response, the Farrens quibble that there were completed, properly installed portions of the project that were damaged: the pool shell; the aluminum tanks, frame and hydraulic cylinders; and the Ipe wood decking.  Nautilus once again has the better cogent argument.

Rock and Water designed and installed all of the pool components and those components needed to be replaced because of Rock and Water's design decisions and material choices.  As it relates to the aluminum components, Rock and Water

16

installed them without protecting them from the chlorine in the pool. While the Farrens may be correct that aluminum can be used in some pools in some situations, it is undisputed that Rock and Water's submersion of the untreated aluminum in chlorine in this case caused it to corrode and degrade. (Doc. 42 at ¶¶ 18–20.) As argued by Nautilus, "your work" includes the materials used in connection with the insured's operations. (*See, e.g.*, Doc. 37-1 at 25.) Consequently, this falls within the definition of "your work." Similarly, as it relates to the Ipe wood decking, while the Farrens may be correct that wood flooring can be an appropriate decking material in Montana, the repeated submersion of this wood under the pool water and its consistent removal and replacement by Rock and Water while it was troubleshooting the pool lift system damaged the floor. This product was therefore once again damaged by Rock and Water's faulty operation of the floating floor and use of the wrong material. (*See* Doc. 42 at ¶¶ 12, 23.) Finally, while the pool shell is a closer question, it also falls within the terms of this exclusion as even if the epoxy was an appropriate material in some pool contexts, Rock and Water installed a component that did not stand up to the intended use here, i.e., the repeated raising and lowering of the nylon wheels that caused the pool shell to scar. (*See id.* ¶ 22.)

The Farrens once again unsuccessfully try to separate out the failures of what they call the "floating pool floor" from its component parts. Because the

property damage alleged here was a result of "your work" by Rock and Water, coverage for those damages is also excluded under j(6).

### C.      Professional Liability Exclusion

The 2016 Policy excludes coverage for property damage "arising out of the rendering of or a failure to render any professional services by you, but only with respect to your providing engineering, architectural or surveying services in your capacity as an engineer, architect or surveyor." (Doc. 37-1 at 33.) The 2016 Policy defines professional services to include "[p]reparing, approving, or failing to prepare or approve . . . shop drawings, opinions, reports, or drawing and specifications" and "[s]upervisory or inspection activities performed as part of any related architectural or engineering activities." (*Id.*) The 2016 Policy further states that "[t]his exclusion does not apply to your operations in connection with construction work performed by you." (*Id.*) This exclusion impacts later policy years as the 2017 and 2018 Policies define "property damage" to include the "continuation, change or resumption" of property damage and state that if the insured was aware of the property damage prior to the policy period, then the "continuation, change or resumption" of that property damage "during or after the policy period will be deemed to have been known prior to the policy period." (Doc. 37-2 at 12; Doc. 37-3 at 11.)

18

In arguing that this exclusion does not apply, the Farrens insist that "Nautilus submitted no evidence that [Rock and Water] acted in the capacity of an engineer, architect, or surveyor." (Doc. 44 at 21.) They also emphasize that Altius Design Group was the architect on the project, and that under the terms of the construction agreement, an independent engineer was to be consulted. (*See* Doc. 45 at 16; Doc. 33-6 at 2, 3.) Farrens argue that the exclusion requires the rendering of "professional services," claiming Rock and Water rendered no such services. In response, Nautilus claims the record shows that Rock and Water designed all of the faulty elements at issue here, and "[t]he fact that Rock and Water lacked the credentials to make these types of design and engineering decisions does not render the exclusion inapplicable." (Doc. 47 at 15.) Once again, Nautilus has the persuasive and better argument.

Under the plain language of this provision, coverage is excluded when a contractor acts in the capacity of an engineer or architect. As contended by Nautilus, that necessarily includes Rock and Water's design of all the pool components that were designed and built here. Indeed, while Rock and Water may have contracted only to build the pool, it is undisputed that Sean Henry, Rock and Water's owner, "said he would design [the pool] himself." (*See* Doc. 42 at ¶ 9.) He then did so. (*See id.* ¶ 10 ("Based on this YouTube video, Rock and Water *designed* a ballast tank system that consisted of nine tanks that were seven feet

19

wide and two feet deep.") (Emphasis added).)  The fact that Sean Henry was not

qualified to perform this design or engineering function does not change the

undisputed fact that he did.  While the Farrens may be correct that the

"professional" component of these services was questionable considering the fact

Henry copied an idea from YouTube, that does not alter the applicability of the

policy terms.  He prepared drawings of the pool and provided a detailed list of its

structural components.  (*See* Doc. 33-6 at 18–30.)  Furthermore, the pay schedule

specifically notes that the first 20% of the pool cost included "completion of

engineering" that would "be completed in R&W WHSE." (*See id.* at 32.)  Thus,

the fact that Rock and Water was not qualified to render the professional services it

provided does not avoid the application of this policy exclusion.

Finally, the Farrens argue that, per its plain terms, this exclusion does not

apply to Rock and Water's construction activities.  While that argument is

persuasive on its face, it once again fails to recognize the services that were

provided here.  The Farrens correctly note that Rock and Water performed the

physical labor and installed the component parts that comprise this project.  But

those activities did not give rise to the Farrens' damages.  The "construction

exception" to the policy exclusion is meant to insulate a contractor from

competently executing a design error when it was not responsible for that design.

But here, Rock and Water competently installed a pool it poorly designed itself.

Based on the foregoing, the professional liability exclusion bars coverage.

## III.   Hillside Erosion

Nautilus takes the position that there is no coverage for the hillside erosion

below the pool caused by the repeated draining of the pool water because (1) the

Policies contain a subsidence exclusion and (2) the jury awarded no repair costs

related to the hillside.  Although Nautilus' subsidence argument lacks merit, it

persuasively argues that there is nothing to indemnify as the jury did not award any

damages for erosion in the underlying action.

### A.   Subsidence Exclusion

The Policies contain a subsidence exclusion that excludes coverage for

property damage "directly or indirectly arising out of, resulting from, contributed

to, aggravated or concurrently caused by subsidence or movement of soil, land,

bedrock or earth, whether natural, manmade or otherwise." (*See, e.g.*, Doc. 37-1 at

40 (internal quotation marks omitted).)  The Policies define "[s]ubsidence or

movement of soil, land, bedrock or earth" as including but "not limited to settling,

bulging, shaking, sinking, slipping, shifting, eroding, rising, tilting, expanding,

contracting, shrinking, instability, falling away, caving in, landslide, mudflow,

flood, sinkhole, earthquake, volcano, or avalanche." (*Id.*)  Nautilus argues that the

"erosion damage" alleged by the Farrens is excluded under this provision.  (Doc.

39 at 28.)  Farrens insist that this exclusion is limited to "damage *caused by* erosion" as opposed to the situation here where the erosion itself is the damage. (Doc. 44 at 25.)  The Farrens have the better argument concerning the policy language.

Per the plain language of the exception, coverage is excluded if the property damage alleged is caused by subsidence, natural or manmade.  But here, the damage *is* the subsidence.  It is undisputed that a substantial amount of water ran down the hillside below the pool whenever the vanishing basin edge was full and Rock and Water attempted to move the floating floor.  (*See* Doc. 42 at ¶ 24.)  This flooding caused the soil below the pool to erode.  (*Id.* ¶ 25.)  Thus, it is not the case where erosion of the hill below the pool caused damage to the pool foundation; rather, as argued by the Farrens, the subsidence *is* the damage.  Thus, this exclusion does not bar coverage for the hillside erosion.

**B.    Jury Award**

Nautilus then argues that even if the subsidence exclusion does not apply, there is still "no coverage for the hillside erosion because the jury did not award any damages associated with the cost to repair damage to the hillside or loss of use of the hillside." (Doc. 39 at 29.)  To support this argument, Nautilus contends that the jury did not hear any evidence regarding either the repair costs for the hillside or loss of use associated with the damage, and that the jury was instructed that

"[t]he measure of damages for injuries to real property is the cost of repair plus damages for loss of use up to the time when the damage reasonably could have been repaired." (Doc. 40 at ¶¶ 31–33). While these facts are undisputed, (*see* Doc. 45 at ¶¶ 31–33), the Farrens argue that (1) the jury award includes all the Farrens' losses associated with the project and (2) if Nautilus wanted the jury to distinguish between covered and noncovered damages, Nautilus should have requested special interrogatories as part of the verdict form. Although Nautilus only responds to the Farrens' first argument, (*see* Doc. 47 at 17–18), it prevails.

The Farrens are generally correct that an insurer waives its rights to itemize covered and noncovered damages when it fails to ask for an allocation of damages at the underlying trial. (*See* Doc. 44 at 27 (collecting cases).) But contrary to the Farrens' position, this is not the case where the jury heard evidence on both covered and noncovered claims and Nautilus is now asking the Court to allocate lump sum damages among those claims. *Compare with Automax Hyundai S., LLC v. Zurich Am. Ins. Co.*, 720 F.3d 798, 808 (10th Cir. 2013) ("[D]amages are presumed to be covered unless the insurer can demonstrate an appropriate allocation." (Internal quotation marks and alteration omitted.)). Rather, it is undisputed that this jury heard *no* evidence regarding the repair cost or cost of loss of use associated with the hillside erosion. Thus, while Nautilus has the duty to

23

indemnify the Farrens for the damages associated with the hillside erosion, no such damages were awarded.

## IV.   Bad Faith

Although the Farrens originally pled that Nautilus acted in bad faith and is therefore on the hook for damages beyond the policy limits of $1,000,000, the Farrens filed a motion dismiss those counter-claims.  (*See* Doc. 48.)  The issue is now moot based on the Court's finding of no coverage above.  *See Steadele v. Colony Ins. Co.*, 260 P.3d 145, 150 (Mont. 2011) ("[W]here an insurance policy excludes coverage, a third party's bad faith claim fails as a matter of law.").

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Nautilus' motion for summary judgment (Doc. 38) is GRANTED and the Farrens' partial motion for summary judgment (Doc. 31) is DENIED.  The Farrens' motion to dismiss (Doc. 48) is DENIED as MOOT.

DATED this _1st_ day of March 2024.

_____
Donald W. Molloy, District Judge
United States District Court